# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MARINER HEALTH CENTRAL, INC., *et al.*,[1] | Case No. 22-10877 (LSS) |
| Debtors. | (Jointly Administered) |
| MARINER HEALTH CENTRAL, INC., PARKVIEW HOLDING COMPANY GP, LLC, AND PARKVIEW OPERATING COMPANY, LP, | Adv. Proc. No. 22-50419 (LSS) |
| Plaintiffs. | |
| v. | |
| UNITED STATES OF AMERICA *ex rel.* INTEGRA MED ANALYTICS LLC, | **Hearing Date: October 25, 2022 at 11:00 a.m. (ET)** **Obj. Deadline: October 18, 2022 at 4:00 p.m. (ET)** |
| Defendant. | |

## MOTION OF THE DEBTORS FOR AN ORDER EXTENDING THE AUTOMATIC STAY, OR IN THE ALTERNATIVE GRANTING INJUNCTIVE RELIEF, TO STAY <u>PROSECUTION OF THE INTEGRA ACTION AGAINST NON-DEBTOR AFFILIATES</u>

---

[1]  The Debtors, along with the last four digits of each Debtors' tax identification number, are Mariner Health Central, Inc. (6203), Parkview Holding Company GP, LLC (1536), and Parkview Operating Company, LP (7273).  The Debtors' headquarters are located at 3060 Mercer University Drive, Suite 200, Atlanta, GA 30341.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

JURISDICTION AND VENUE ........................................................................................... 2

FACTUAL BACKGROUND................................................................................................. 3

   A.  The Chapter 11 Cases ........................................................................................... 3

   B.  The Integra Action ................................................................................................ 4

   C.  The Integra Action Allegations............................................................................. 5

   D.  The Debtors' Indemnification Obligations .......................................................... 6

   E.  The Discovery and Litigation Burdens on the Debtors ........................................ 7

   F.  The Debtors' Reorganization Efforts ................................................................... 9

RELIEF REQUESTED........................................................................................................ 9

BASIS FOR RELIEF REQUESTED .................................................................................. 9

   A.  The Automatic Stay Should Be Extended ....................................................... 10

       i.      Allowing the Integra Action to Continue will Heavily Prejudice the Debtors ..... 13

       ii.     Allowing the Integra Action to Continue Will Heavily Burden the Debtors ....... 14

       iii.    Mariner Central is Obligated to Indemnify the Operators .................................. 15

   B.  In the Alternative, the Continuation of the Integra Action Should be Enjoined................ 17

       i.      There is a Reasonable Likelihood that the Debtors Will Successfully
           Restructure ........................................................................................................ 18

       ii.     Continuation of the Integra Action Will Irreparably Harm The Debtors ............ 20

       iii.    The Balance of Harms Favors the Debtors ........................................................ 22

       iv.    An Injunction Serves the Public Interest ............................................................ 23

RESERVATION OF RIGHTS ........................................................................................... 23

NOTICE................................................................................................................................. 24

CONCLUSION...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986).......................................................................................... 11, 13

*Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*,
111 B.R. 423 (Bankr. S.D.N.Y. 1990) ....................................................................... 12, 13, 18

*Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*,
No. 06-5358 (PKC), 2006 WL 3755175, at *5 (S.D.N.Y. Dec. 20, 2006) .............................. 21

*In re 1031 Tax Grp., LLC*,
397 B.R. 670 (Bankr. S.D.N.Y. 2008) ................................................................................... 22

*In re Adelphia Commc'ns*,
302 B.R. 439 (Bankr. S.D.N.Y. 2003) ................................................................................... 20

*In re Am. Film Techs., Inc.*,
175 B.R. 847 (Bankr. D. Del. 1994) ......................................................................... 12, 20, 23

*In re Caesars Ent. Operating Co.*,
808 F.3d 1186 (7th Cir. 2015)............................................................................................... 23

*In re Calpine Corp.*,
354 B.R. 45 (Bankr. S.D.N.Y. 2006) ....................................................................... 11, 20, 22

*In re Cont'l Airlines*,
177 B.R. 475 (D. Del. 1993) ................................................................................................. 21

*In re Eagle-Picher Indus., Inc.*,
963 F.2d 855 (6th Cir. 1992)........................................................................................... 11, 19

*In re Ionosphere Clubs, Inc.*,
124 B.R. 635, 642 (S.D.N.Y. 1991) ................................................................................ 17, 18

*In re Lyondell Chem. Co.*,
402 B.R. 571 (Bankr. S.D.N.Y. 2009) ................................................................................... 18

*In re Midway Games, Inc.*,
428 B.R. 327 (Bankr. D. Del. 2010) ................................................................................ 10, 11

*In re Sudbury, Inc.*,
140 B.R. 461 (Bankr. N.D. Oh. 1992) ............................................................................. 12, 19

*In re Union Trust Phila., LLC*,
465 B.R. 765 (Bankr. E.D. Pa. 2011), *aff'd*, 460 B.R. 644 (E.D. Pa. 2011)........................... 18

*In re United Health Care*,
210 B.R. 228 (S.D.N.Y. 1997) ......................................................................................... 11, 22

*In re Univ. Med. Ctr.*,
    973 F.2d 1065 (3d Cir. 1992) .................................................................................... 10

*In re W.R. Grace & Co.*,
    412 B.R. 657 (D. Del. 2009) ...................................................................................... 18

*Lomas Fin. Corp. v. Northern Trust Co. (In re Lomas Fin. Corp.)*,
    117 B.R. 64 (S.D.N.Y. 1990) ..................................................................................... 21

*Majestic Star Casino v. City of Gary (In re Majestic Star Casino, LLC)*,
    No. 10-50841(KG), 2010 WL 2540457 at *2 (Bankr. D. Del. Apr. 24, 2010) ......................... 12

*McCartney v. Integra Nat. Bank N.*,
    106 F.3d 506 (3d Cir. 1997) ................................................................................ 11, 17

*Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*,
    365 B.R. 401 (S.D.N.Y. 2007) ............................................................................. 21, 23

*Queenie, Ltd. v. Nygard Int'l*,
    321 F.3d 282 (2d Cir. 2003) ................................................................................ 11, 13

**Statutes**

11 U.S.C. § 105(a)(1) ....................................................................................... 10, 17

11 U.S.C. § 362(a)(1) .......................................................................................... 9-10

11 U.S.C. § 362(a)(3) ............................................................................................ 10

**Other Authorities**

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. (1977) ..................................................... 10

Plaintiffs, as debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and as plaintiffs in this adversary proceeding, hereby move (this "**Motion**") for the entry of an order extending the automatic stay pursuant to sections 105 and 362 of the Bankruptcy Code to stay or enjoin the continuation of the Integra Action against the Non-Debtor Affiliates (as such terms are defined below).  In support of this Motion, the Debtors rely upon their complaint, the *Declaration of Kristy Owen in Support of Motion of the Debtors for an Order Extending the Automatic Stay, or in the Alternative Granting Injunctive Relief, to Stay Prosecution of the Integra Action Against Non-Debtor Affiliates* (the "**Owen Declaration**"), filed contemporaneously herewith, and the *Declaration of Lawrence R. Perkins in Support of Chapter 11 Petitions and First Day Pleadings* (the "**Perkins Declaration**"), filed on the main docket for these Chapter 11 Cases, and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the Debtors request declaratory or injunctive relief to prevent the Defendant from continuing the action captioned *United States of America ex rel. Integra Med Analytics LLC v. Mariner Health Care Inc. et al.*, Case No. 3:18-CV-00653-EMC (N.D. Cal.) (the "**Integra Action**"), a *qui tam* action bringing claims under the False Claims Act for alleged overbilling of therapy services to residents.

2.      The Defendant, the relator-plaintiff in the Integra Action ("**Integra**"), is not a whistleblower and has no prior relationship with or connection to any of the Debtors or their affiliates, but instead bases its allegations on its review of Medicare billing data.  All of its allegations involve actions either of Debtor Parkview Operating Company, LP ("**Parkview**") or of Debtor Mariner Health Central, Inc. ("**Mariner Central**"), the party responsible for billing

1

Medicare for services rendered by Debtor Parkview and its affiliates pursuant to applicable support services agreements.

3.       If the Integra Action is allowed to continue against the non-debtor affiliates of the Debtors named therein (the "**Non-Debtor Affiliates**"): (a) the Debtors face significant estoppel, preclusion and/or evidentiary prejudice, (b) the Debtors face heavy discovery and litigation burdens that will significantly interfere with their restructuring efforts, (c) the Debtors face significant indemnification and advancement claims from the Non-Debtor Affiliates, and (d) insurance policies and proceeds that are property of the Debtors' estates will be depleted. Accordingly, the Court should extend the automatic stay to stay, or enjoin the continuation of, the Integra Action against the Non-Debtor Affiliates during these Chapter 11 Cases.

## JURISDICTION AND VENUE

4.       The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.       The bases for the relief requested herein are sections 105(a), 362(a)(1), and 362(a)(3) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

6.       The Debtors confirm their consent to the entry of a final order by the Court in connection with this adversary proceeding if later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

A.    **The Chapter 11 Cases**

7.    On September 19, 2022 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the Chapter 11 Cases. The Chapter 11 Cases are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b).  The Debtors are operating as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these cases, and no official committees have been appointed or designated.

8.    The three Debtors are part of the Mariner Health Care group of healthcare services providers, consultants and holding companies, all of which are direct or indirect subsidiaries of non-Debtor Mariner Health Care, Inc. (collectively, the "**Mariner Companies**").  Certain of the Mariner Companies operate 20 skilled nursing facilities (the "**Mariner Facilities**"), with nearly 2,200 licensed beds and approximately 3,100 employees, that provide short-term rehabilitation, comprehensive post-acute skilled care, long-term care, therapy, and other services.  Perkins Decl. ¶ 9.  For more than 30 years, the Mariner Facilities have delivered quality, affordable care to historically underserved persons and communities.  *Id.*  Additional information regarding the Debtors' operations, structure, liabilities, and the events leading up to the commencement of these cases is set forth in the Perkins Declaration, which is incorporated herein by reference.

9.    Parkview operates a skilled nursing facility with 121 beds located in Hayward, California (the "**Parkview Facility**"), while Debtor Mariner Health Central, Inc. ("**Mariner Central**") provides administrative, clinical and operational support services to Parkview and to the other Mariner Companies that operate the Mariner Facilities (collectively with Parkview, the

"**Operators**").  Perkins Decl. ¶ 11.  Debtor Parkview Holding Company GP, LLC is the general partner of Parkview.  *Id.*

10.      Each Operator is party to an Administrative, Clinical and Operational Support Agreement (each, a "**Support Agreement**") with Mariner Central, a form of which is attached as Exhibit A to the Owen Declaration.  Under the Support Agreements, Mariner Central provides each counterparty Operator with various services such as: (a) administration of payroll and personnel services: (b) bookkeeping, accounting and related administrative support, budgeting, financial analysis and reporting; (c) billing and collection services; (d) orderly and timely payments of all accounts payable related to the operations of the applicable Facility, including taxes, insurance premiums, and vendor payables; (e) assistance in securing insurance; (f) handling Medicaid, Medi-Cal, and other reimbursement programs; (g) preparation and filing of tax returns; (h) negotiating and managing national contracts and other purchasing services; and (i) insurance procurement.  Perkins Decl. ¶ 14.

11.      Mariner Central also (i) bills and submits claims to Medicare, and is responsible for reporting and returning overpayments, on behalf of the Operators; (ii) coordinates offsite document storage; (iii) assists Operators with clinical support, including providing policies and procedures and training thereon, and provides a wide range of supporting activities through operational support teams; and (iv) provides in-house counsel, legal support and compliance services to the Operators and obtains, directs and coordinates with outside counsel as needed.  Owen Decl. ¶¶ 7,8.

**B.**    **The Integra Action**

12.      The Integra Action was initially commenced in 2018 asserting claims under the False Claims Act and under the California False Claims Action for Medicare and Medi-Cal billings

at the Mariner Facilities.[1]  The United States and the State of California declined to intervene in July 2019, and subsequently a first amended complaint (the "**Integra Complaint**," a copy of which is attached as Exhibit B to the Owen Declaration) was filed on February 19, 2020.  The Medi-Cal claims were voluntarily dismissed without prejudice on July 30, 2020.  On September 21, 2021, the defendants filed their answer denying the allegations of the Integra Complaint and asserting affirmative defenses thereto.  Owen Decl. ¶ 10.

## C.    The Integra Action Allegations

13.    The Integra Complaint alleges that "Mariner," defined as all defendants named therein collectively, submitted false or fraudulent claims to Medicare, and further violated the FCA by failing to report and return overpayments from Medicare.  *E.g.*, Integra Compl. ¶¶ 145-146.

14.    The Integra Complaint also alleges such actions to have been orchestrated by the "management," "upper management," "ownership," and "leadership" of "Mariner" across the Mariner Facilities.  *E.g.*, Integra Compl. ¶¶ 3, 35, 55-60.

15.    The Integra Complaint relies on patient data alleged to be from all Mariner Facilities between January 1, 2011 and October 1, 2016.  *E.g.*, Integra Compl. ¶ 61 fn. 18.

16.    The allegations of the Integra Complaint in relevant part relate to the Mariner Facilities collectively.  *E.g.* Integra Compl. ¶¶ 35 (". . . Mariner deliberately submitted false claims to Medicare . . ."), 48 (". . . Mariner inappropriately and excessively kept patients in their facilities . . ."), 53 (". . . Mariner also directed its staff to bill for non-therapeutic activities.").

---

[1] The named defendants in the Integra Action are Mariner Health Care Inc., various Operators, and GranCare, LLC, an indirect parent of Parkview which is alleged to have been doing business as various Mariner Facilities including but not limited to the Parkview Facility (despite Parkview having been in existence and operating during certain periods at issue in the Integra Action).  The Debtors and Non-Debtor Affiliates reserve all of their rights with respect to such identification of defendants.

17.     The allegations of the Integra Complaint do not in relevant part distinguish among Operators, among defendants, or between the Parkview Facility or any other Mariner Facility.[2] *E.g.* Integra Compl. ¶¶ 35 (". . . Mariner deliberately submitted false claims to Medicare . . ."), 71 (". . . Mariner . . . bills for excessive Ultra High Rehab indiscriminately across all of the patient diagnoses it sees."), 79 (without differentiating among Mariner Facilities, comparing the average "Ultra High Rehab" requirements of 1,153 patients across all Mariner Facilities with the average across all unaffiliated skilled nursing facilities), 143 (". . . the excessive Ultra High Rehab practices were intentionally implemented by Mariner across the facilities in their system.").

18.     Integra seeks more than $94.58 million for its asserted claims.  Integra Compl. ¶ 1.

### D.     The Debtors' Indemnification Obligations

19.     Debtor Mariner Central is contractually obligated under each Support Agreement to indemnify and defend the counterparty Operator and such Operator's managers, employees, affiliates for any and all claims and losses incurred in connection with any breaches or failures by Mariner Central of its obligations, or any negligent act or fraud by Mariner Central.  Specifically, each Support Agreement requires that:

> [Mariner Central] shall indemnify and hold Operator and Operator's officers, directors, equity holders, members, managers, employees and affiliates harmless from any and all claims, losses, judgments, damages, expenses and liabilities whatsoever (including reasonable attorneys' fees) incurred by any of them in connection with, by reason of, or arising out of: (a) the breach or failure of any obligation of [Mariner Central] that is contained in this Agreement or (b) any

---

[2] Although the Integra Complaint includes certain allegations relating to particular Facilities (*i.e.,* alleged quotations of unidentified former employees of a particular Facility or of Facility-specific incidents), these are used solely to support allegations or claims regarding "Mariner" collectively and not for any Facility-specific purpose.  *See, e.g.,* Integra Compl. ¶ 37.  Select paragraphs of the Integra Complaint also describe certain facility-level information, again only to support allegations or claims regarding "Mariner" collectively.  *E.g., id.* ¶¶ 99, 127.  Therefore, for all purposes relevant here, the Integra Complaint does not differentiate between any Mariner Facilities or among defendants thereto.

> third party claims which are caused by [Mariner Central] in whole
> or in part through any negligent act, willful omission, [or] fraud . . .

Support Agreement § 6.1.

20.     The claims alleged in the Integra Action are within Mariner Central's indemnification and advancement obligations to the Operators and their personnel under the Support Agreements.  Owen Decl. ¶ 18.

21.     In addition, the Mariner Central certificate of incorporation and bylaws both provide for indemnification and advancement to all persons made party or otherwise involved in any action by reason of being a current and former director and officer of Mariner Central or its predecessors, or by reason of service as a director, officer, employee or agent of any other entity at the request of Mariner Central.  Owen Decl. ¶ 18.  If resulting in officer or employee costs or losses, the Integra Action may also lead to indemnification and advancement obligations for Mariner Central under its organizational documents.  *Id.*

**E.    <u>The Discovery and Litigation Burdens on the Debtors</u>**

22.     The Integra Action is presently in the initial discovery stage, and the parties have not yet exchanged initial disclosures pursuant to Federal Rule of Civil Procedure 26(f).  Owen Decl. ¶ 12.

23.     The allegations of the Integra Complaint relate to billing and treatment practices concerning all patients for the subject Mariner Facilities over the 2011 – 2018 period.  Owen Decl. ¶ 13.  Discovery in connection with such allegations could require all documents and communications relating to the treatment practices for across multiple skilled nursing facilities and thousands upon thousands of patients over a multi-year period.  *Id.*  Such requests could easily total millions of pages.  *Id.*

24.     Much, if not most, of the information necessary to prosecute or defend the Integra Action claims, such as billing statements, financial and administrative records or relevant emails, is within the possession or control of Mariner Central.  Owen Decl. ¶ 14.  For example, Mariner Central is responsible for, and contracts with third parties to obtain, data and records storage.  *Id.* ¶ 8.  Indeed, the substantial majority of relevant information is likely to be within the possession or control of Mariner Central.  *Id.* ¶ 14.

25.     In contrast, only some of the relevant information will be within the possession or control of the Operators.  Owen Decl. ¶ 14.  This includes information within the possession or control of Debtor Parkview, which will be responsive in light of the collective allegations of the Integra Action.  *Id.*

26.     Many of the witnesses will also be current or former employees of Mariner Central who have knowledge of the issues raised in the complaints, including the billing and patient treatment practices.  Owen Decl. ¶ 15.

27.     The Operators rely on Mariner Central to provide in-house legal and compliance services and to coordinate with external counsel in addressing litigation and responding to discovery requests.  Owen Decl. ¶¶ 8, 16.  The Operators do not have internal in-house legal functions or the internal capability to perform these functions or otherwise manage a defense of the Integra Action.  *Id.*  The Operators rely on Mariner Central to manage and coordinate the Operators' defense of the Integra Action.  *Id.*

28.     If the Integra Action proceeds, the costly and time-intensive burdens to respond to discovery, oversee outside counsel and manage the defense of the Non-Debtor Affiliates would inevitably fall heavily on Mariner Central personnel.  Owen Decl. ¶ 17.  Such efforts would

consume significant time and resources, distract management, and interfere with their ability to restructure successfully. *Id.*

**F.    The Debtors' Reorganization Efforts**

29.    The Debtors have businesses that are generally profitable on an operating basis, have unencumbered assets and no secured creditors, are generally paying their bills as they come due, and have a relatively limited set of creditors and claims. *See* Perkins Decl. ¶¶ 15, 18, 37. While the Debtors lack the ability to satisfy all claims asserted against them in full after recent adverse litigation developments, with the benefit of the automatic stay and a breathing spell from litigation, the Debtors expect to be able to formulate a plan of reorganization that preserves operations, protects patients, has the requisite creditor support, and otherwise satisfies the requirements of the Bankruptcy Code for confirmation. *See* Perkins Decl. ¶¶ 15, 33, 34; Owen Decl. ¶ 25. The Debtors are working towards formulating and filing a plan of reorganization within weeks.

**RELIEF REQUESTED**

30.    The Debtors seek a declaratory judgment, pursuant to sections 105(a), 362(a)(1) and 362(a)(3) of the Bankruptcy Code, extending the automatic stay to prevent the Defendant from continuing to prosecute the Integra Action, or in the alternative, enjoining the continued prosecution of the Integra Action pursuant to section 105(a) of the Bankruptcy Code, in either instance during the pendency of the Chapter 11 Cases.

**BASIS FOR RELIEF REQUESTED**

31.    Section 362 of the Bankruptcy Code automatically stays "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to

recover a claim against the debtor that arose before the commencement of the case under this title," as well as "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. §§ 362(a)(1), (3).

32.     As stated by Congress:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally.

H.R. Rep. No. 95-595, 340, 95th Cong., 1st Sess. (1977).

33.     The automatic stay implements "the Bankruptcy Code's goal of providing the debtor with a breathing spell from creditors in order to permit the debtor to attempt repayment or reorganization."  *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1074 (3d Cir. 1992); *In re Midway Games, Inc.*, 428 B.R. 327, 333 (Bankr. D. Del. 2010) (the automatic stay is designed "to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor").

A.     **The Automatic Stay Should Be Extended**

34.     The Bankruptcy Code expressly authorizes the issuance of "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a)(1).  "Consistent with congressional intent and with the fundamental purposes underlying the automatic stay, numerous federal courts have held that, under appropriate circumstances, the

automatic stay may be extended beyond direct actions against the debtor to lawsuits against non-debtors." *Midway Games*, 428 B.R. at 333.

35.     Such circumstances include "where stay protection is essential to the debtor's efforts of reorganization," *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997), "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate," *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287-88 (2d Cir. 2003), or "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986); *see also Midway Games*, 428 B.R. at 334 ("Courts in this Circuit and others have held that [] the automatic stay . . . is properly extended to actions against non-debtors where an "identity of interest" exists between the debtor and non-debtor defendant such that the debtor is the real party defendant and the litigation will directly affect the debtor and, more specifically, the debtor's assets or its ability to pursue a successful plan of reorganization or liquidation under Chapter 11."). Without such extensions of the automatic stay, "Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code." *In re Calpine Corp.*, 354 B.R. 45, 49 (Bankr. S.D.N.Y. 2006) (quotation omitted).

36.     Accordingly, the automatic stay has been extended to enjoin litigation against non-debtors where the debtor is obligated to indemnify the non-debtor or otherwise would suffer from an adverse litigation outcome.  *See, e.g., Queenie*, 321 F.3d at 287-88 (where the non-debtor was wholly owned by the debtor); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 860 (6th Cir. 1992) (where the debtor had a duty to indemnify its executives and to reimburse their legal costs); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 850-51 (Bankr. D. Del. 1994) (where the debtor had a duty

to indemnify and where there was a risk of collateral estoppel). The automatic stay has also been extended where the subject litigation threatens to divert the attention of a debtor's key personnel from the reorganization efforts. *See, e.g., Majestic Star Casino v. City of Gary (In re Majestic Star Casino, LLC),* No. 10-50841(KG), 2010 WL 2540457 at *2 (Bankr. D. Del. Apr. 24, 2010) (extending the automatic stay where not doing so "will directly and significantly interfere with the Debtors' reorganization efforts because senior management will have to defend themselves"); *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990) (extending the automatic stay to a debtor's chairman based on the fact he was essential to the debtor's reorganization); *In re Sudbury, Inc.*, 140 B.R. 461, 465 (Bankr. N.D. Oh. 1992) (irreparable harm results when resources of debtor are consumed in third-party litigation).

37.    This Court should extend the automatic stay pursuant to sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code to enjoin the continued prosecution of the Integra Action against the Non-Debtor Affiliates during the pendency of these Chapter 11 Cases. As set forth below, because the claims and facts asserted, and issues of law involved, are inextricably intertwined, there is an identity of interest between the Debtors and the Non-Debtor Affiliates with respect to the Integra Action such that allowing its continuation against the Non-Debtors Affiliates is tantamount to allowing its continuation against the Debtors. The continued prosecution of the Integra Action exposes the Debtors to significant estoppel, preclusion, and evidentiary prejudice; to burdensome discovery and litigation obligations that would consume significant time and resources, distract their management, negate the benefits of the automatic stay, and jeopardize their ability to restructure successfully; and to substantial indemnification and advancement claims that would significantly harm the estate and creditors. Allowing the Integra Action to proceed against the Non-Debtor Affiliates will greatly impair the Debtors' prospects for a successful

reorganization. Accordingly, extending the automatic stay to the continuation of the Integra Action against the Non-Debtor Affiliates is necessary or appropriate to afford the Debtors a breathing spell from creditors and from litigation pressures to pursue reorganization.

i.      *Allowing the Integra Action to Continue will Heavily Prejudice the Debtors*

38.     Courts have long recognized that extension of the automatic stay to non-debtors is appropriate where "there is such identity between the debtor and the third-party defendant" that a finding or "judgment against the third- party defendant will in effect be a judgment or finding against the debtor." *A.H. Robins*, 788 F.2d at 999; *accord Queenie*, 321 F.3d at 288; *see also Ionosphere Clubs,* 111 B.R. at 434 ("a stay should be provided to codefendants when the claims against them and the claims against the debtor are inextricably interwoven, presenting common questions of law and fact, which can be resolved in one proceeding.").

39.     The allegations and claims of the Integra Action against the Non-Debtor Affiliates are "inextricably interwoven" with the allegations and claims against the Debtors and present common legal and factual questions. Indeed, the Integra Action does not differentiate whatsoever in its allegations and claims among the Debtors or Non-Debtor Affiliates. The Integra Action rests on allegations that "Mariner," defined in the Integra Complaint as all defendants named therein collectively, submitted false or fraudulent claims to Medicare, and further violated the FCA by failing to report and return overpayments from Medicare, and that such actions were orchestrated across the Mariner Facilities by Mariner management or leadership. Because the Mariner Facilities are alleged to have engaged in the same conduct and violations, a finding of liability for an Operator that is a Non-Debtor Affiliate would necessarily mean a finding of liability for Parkview on essentially identical facts, circumstances and legal issues. Moreover, the wrongful acts or omissions alleged by the Integra Complaint are inextricably interwoven with Mariner

Central's obligations and services to the Operators under the Support Agreements, and therefore any finding of liability against a Non-Debtor Affiliate would necessarily include a finding that Mariner Central acted wrongfully.

40.     Given the commonality between the Debtors and the Non-Debtor Affiliates with respect to the Integra Action allegations, any decisions against the Non-Debtor Affiliates – whether decisions on discovery disputes, dispositive motions, factual findings, evidentiary or procedural questions, liability or damages – would necessarily have estoppel, preclusive or prejudicial effect for subsequent litigation against the Debtors and effectively would be decisions against the Debtors.

### ii.     *Allowing the Integra Action to Continue Will Heavily Burden the Debtors*

41.     The Debtors will be heavily burdened if the Integra Action is allowed to continue against the Non-Debtor Affiliates.  The Integra Action will soon enter the discovery phase and the scope will be voluminous:  Integra's allegations relate to the treatments and billings for thousands upon thousands of patients across multiple skilled nursing facilities over a 8-year period ending nearly 4 years ago.  Owen Decl. ¶ 13.  Related discovery could easily involve millions of pages, likely requiring retrieval and restoration of both hardcopy and electronic records from offsite or archival storage, tens of depositions, and multiple expert reports.  *Id.*

42.     Much of the information necessary to prosecute or defend Integra's claims, such as medical charts, billing statements, financial and administrative records, or relevant emails is within the possession or control of Mariner Central and not of the Operators.  Owen Decl. ¶ 14.  In addition, given the collective nature of the allegations in the Integra Action, any such information with the possession or control of Parkview relating to its own residents would be relevant and responsive.  *Id.*  Multiple Mariner Central employees will be identified as part of the initial

disclosures and will be deposed in the discovery process. *Id.* ¶ 15.  Thus, extensive discovery from the Debtors is inevitable if the Integra Action is allowed to continue.

43.     The burden on the Debtors from allowing the Integra Action to continue against Non-Debtor Affiliates is not limited to locating, reviewing and producing millions of pages of records or making employees available for deposition (and indemnifying them as required by Mariner Central's organizational documents).  Rather, the Operators rely on Mariner Central to provide all in-house counsel and legal support services, and to coordinate with and oversee outside counsel in accordance with the Support Agreements.  The Operators simply do not have the ability to defend themselves against the Integra Action without the services of Mariner Central. Accordingly, if the Integra Action is allowed to continue against Non-Debtor Affiliates, Mariner Central will be forced to manage and coordinate the Operators' defense or face significant damages claims from the Operators.

44.     Such efforts will inevitably impose a costly and time-intensive burden on the Mariner Central officers and in-house legal team and will rob their attention from efforts to stabilize operations, pursue the Ledesma appeals, preserve value for the Debtors' estates, evaluate creditor claims, and formulate a plan of reorganization.  Owen Decl. ¶¶ 9, 17.  Allowing the Integra Action to continue against the Non-Debtor Affiliates would leave Mariner Central with effectively the same litigation burdens as before it commenced its bankruptcy case.  This would frustrate the purposes of the Bankruptcy Code by robbing Mariner Central of a breathing spell to pursue reorganization and formulate a restructuring plan.

### iii.        *Mariner Central is Obligated to Indemnify the Operators*

45.     Mariner Central faces significant indemnification and advancement claims if the Integra Action is allowed to continue against the Non-Debtor Affiliates.  Mariner Central is

contractually obligated under each Support Agreement to indemnify and defend the counterparty Operator and such Operator's managers, employees, and affiliates, among others, for any and all claims, losses and expenses incurred "in connection with, by reason of, or arising out of . . . the breach or failure of any obligation of" Mariner Central under the Support Agreement.  Support Agreement § 6.1(a).  Debtor Mariner Central is also contractually obligated under each Support Agreement to indemnify and defend the counterparty Operator and such Operator's managers, employees, affiliates, among others, for any and all claims, losses and expenses incurred "in connection with, by reason of, or arising out of . . . any third party claims which are caused by [Mariner Central] in whole or in part through any negligent act, willful omission, [or] fraud . . ." Support Agreement § 6.1(b).  These provisions readily encompass the claims and allegations of the Integra Complaint.

46.     The Integra Complaint claims that "Mariner" (defined in the Integra Complaint as all defendants named therein collectively) "submitted and/or caused to be submitted false or fraudulent claims to Medicare . . ." and "fail[ed] to report and return overpayments from Medicare . . ."  Integra Compl. ¶ 145.  The Integra Complaint also alleges that "Mariner" management or leadership orchestrated the alleged wrongful conduct across the Mariner Facilities.  *E.g.*, Integra Compl. ¶¶ 35, 55.  Both the billing-related allegations and the management orchestration allegations relate to actions by Mariner Central in providing the administrative, clinical and operational support services to the Operators under the Support Agreements.  Accordingly, any liability of the Operators for such claims would be (i) incurred "in connection with, by reason of, or arising out of . . . the breach or failure" of Mariner Central of its obligations under the Support Agreements, and (ii) incurred "in connection with, by reason of, or arising out of . . . any third party claims which are caused by [Mariner Central] in whole or in part through any negligent act,

willful omission, [or] fraud . . ." within the terms of Mariner Central's indemnification obligations. Even without express contractual indemnification obligations, as the party responsible for billing and submitting claims to Medicare and/or failing to report and return overpayments on behalf of the Operators, Mariner Central would be exposed to equitable indemnity or contribution claims from the Operators for liability in the Integra Action.

47.     These obligations, including for costs of defense, potential settlements, and judgments, would be a heavy burden on Mariner Central's estate.  The costs to defend the Integra Action have exceeded $920,000 to date and all available insurance coverage for such costs has already been exhausted.  Owen Decl. ¶ 20.  Such costs are expected to significantly increase as formal discovery commences and the parties engage in document review and discovery.  *Id.*  If Mariner Central is required to fund such costs from cash on hand, such costs will substantially harm the Debtors' estates and creditors and impair the Debtors' reorganization efforts.

**B.      In the Alternative, the Continuation of the Integra Action Should be Enjoined**

48.     Alternatively, enjoining continuation of the Integra Action on a temporary basis under section 105 is warranted so that the Debtors may avoid irreparable harm and pursue a reorganization for the benefit of all creditors and stakeholders.  11 U.S.C. § 105(a) (bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]").  Bankruptcy courts have employed this power to enjoin actions by creditors against non-debtors when doing so would protect the debtor's estate or its ability to reorganize.  *See, e.g., McCartney*, 106 F.3d at 510 (bankruptcy court has the authority to enjoin an activity that threatens the reorganization process or impairs its jurisdiction over a case before it); *see also In re Ionosphere Clubs, Inc.*, 124 B.R. 635, 642 (S.D.N.Y. 1991) (affirming section 105(a) injunction precluding action against non-debtor and explaining that section 105(a)

"extends to creditor's actions against third parties, when such an injunction is necessary to protect the debtors and the parties in interest to the reorganization in their attempt to reorganize successfully").

49.    To obtain an injunction under section 105, the debtor must show such relief is warranted under the traditional injunction factors as modified to fit the bankruptcy context.   Those factors are "(1) a likelihood of success on the merits; (2) that [the Debtor] would suffer irreparable harm if the injunction is not granted; (3) the extent to which the [non-movant] would suffer irreparable harm if the injunction was issued; and (4) whether the public interest will be harmed." *In re W.R. Grace & Co.*, 412 B.R. 657, 665 (D. Del. 2009).

### i.    *There is a Reasonable Likelihood that the Debtors Will Successfully Restructure*

50.    In the bankruptcy context, success on the merits is considered to be confirmation of a plan of reorganization.  *In re Sudbury, Inc.*, 140 B.R. 461, 466 (Bankr. N.D. Ohio 1992) ("The courts in this circumstance have held that success on the merits is to be evaluated in terms of the likelihood of a successful reorganization.").  A reasonable likelihood of a successful reorganization exists where "the Debtors are proceeding on track, and there is no reason to believe or suspect that their reorganization will fail – unless, of course, the acts sought to be enjoined cause it to fail." *In re Lyondell Chem. Co.*, 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009) (explaining that "the Debtors have so far been successful in doing everything they've needed to do to date," and because they "have met the challenges they have faced so far, that is sufficient"); *accord In re Union Trust Phila., LLC*, 465 B.R. 765, 773 (Bankr. E.D. Pa. 2011), *aff'd*, 460 B.R. 644 (E.D. Pa. 2011) (finding a reasonable likelihood of a successful reorganization where the debtor had obtained the use of cash collateral and was continuing to operate such that the "prospects for a successful reorganization remain viable"); *Sudbury,* 140 B.R. at 466 (finding a likelihood of success where

"the Debtor is hard at work on a reorganization plan [and the objectors] do not suggest that Debtor's effort will fail.") *see also Eagle-Picher*, 963 F.2d at 859-60 (in affirming an injunction against continuation of state court litigation against non-debtors, concluding that the "likelihood of success" factor was satisfied by bankruptcy court's implicit finding, based on the proceedings before it after one month in bankruptcy, that the debtor "had some realistic possibility of successfully reorganizing under Chapter 11").

51.     The Debtors generally operate on a positive cash flow basis and have no encumbered assets.  Perkins Decl. ¶¶ 15, 18.  As shown on the Debtors' list of top creditors, the Debtors have a diverse but relatively discrete set of claims and constituencies, including landlords, trade creditors, contract counterparties, residents, employees, judgment creditors, contingent litigation claims, and regulators.  The Debtors have to date successfully weathered significant headwinds from the pandemic and related general economic and industry-specific adverse developments, so much so that they did not require postpetition financing to commence these Chapter 11 Cases.  Perkins Decl. ¶¶ 33, 34, 37.  It appears highly likely that the Debtors' estates and their creditors will realize greater value from the Debtors' continuation as a going concern rather than liquidating, *see* Perkins Decl. ¶ 36, and no party has sought to dismiss or convert these Chapter 11 Cases.  The Debtors have successfully obtained their requested first day relief, have continued operating in the ordinary course, and intend to propose a plan of reorganization within weeks.  Indeed, because the Debtors provide a valuable service for the community, and because the Debtors are viable on a go forward basis, it is likely that the Debtors will be able to garner support from key stakeholder constituencies for a reasonable plan of reorganization.  Accordingly, the Debtors plainly have a reasonable likelihood of successfully reorganizing.

### ii.        *Continuation of the Integra Action Will Irreparably Harm The Debtors*

52.        If the Integra Action continues against the Non-Debtor Affiliates, the inevitable estoppel, preclusion and prejudice will irreparably harm the Debtors' ability to defend themselves in subsequent proceedings.  The allegations and claims of the Integra Action with respect to Parkview are the same as for other Operators that are Non-Debtor Affiliates, and all such allegations and claims are inextricably interwoven with the conduct of Mariner Central as the party responsible for billing and submitting claims to Medicare, and/or reporting and returning overpayments, as well as training employees and assisting with compliance, on behalf of the Operators as well as for providing "management" or "leadership" across the Mariner Facilities that allegedly orchestrated the fraudulent billing procedures.  As discussed above, any decisions against the Non-Debtor Affiliates – whether on discovery disputes, dispositive motions, factual findings, evidentiary or procedural questions, liability or damages – would necessarily have estoppel, preclusive or prejudicial effect for subsequent litigation against the Debtors.

53.        Numerous courts have recognized that such developments constitute irreparable harm supporting a section 105(a) injunction.  *See, e.g., Am. Film Techs.,* 175 B.R. at 855 ("because of the identity of subject matter, issues and parties involved, the [subject litigation] squarely implicates [the debtor's] indemnification obligations and exposes it to collateral estoppel prejudice if it does not participate in that case. This conclusion justifies the invocation of Code § 105 to issue a preliminary injunction order"); *In re Adelphia Commc'ns*, 302 B.R. 439, 451 (Bankr. S.D.N.Y. 2003) ("The courts in this and other districts have repeatedly recognized that section 105 may be used to enjoin litigation against non-debtors where there is the potential threat of the debtor being collaterally estopped from asserting defenses if an adverse judgment is entered against the non-debtors."); *In re Calpine Corp.*, 354 B.R. at 50 ("In light of the identity of interest between [the debtor] and [the non-debtor], [the debtor] will suffer irreparable harm if the [third party litigation]

continues through the risk of collateral estoppel and evidentiary prejudice ….”); *Lomas Fin. Corp.*

*v. Northern Trust Co. (In re Lomas Fin. Corp.)*, 117 B.R. 64, 67 (S.D.N.Y. 1990) (“The threat of

collateral estoppel would force [the debtor’s key personnel] to participate in the [action] … thus

causing the corporation and its reorganization plan irreparable harm.”).

54.     In addition, if the Integra Action continues against the Non-Debtor Affiliates, the

burden of discovery, and indeed the burden of overseeing and managing the defense of the Integra

Action, will inevitably fall on Mariner Central as discussed above.  These burdens will distract key

Mariner Central personnel and will irreparably harm the Debtors’ efforts to restructure.  *See In re*

*Cont’l Airlines*, 177 B.R. 475, 481 n.6 (D. Del. 1993) (“In a bankruptcy context, irreparable harm

may be discerned if the action sought to be enjoined would so consume the time, energy and

resources of the debtor that it would substantially hinder the debtor's reorganization effort.”)

(quotation omitted); *Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401,

412 (S.D.N.Y. 2007) (finding that the debtors “would suffer irreparable harm if [a key employee]

were distracted from his responsibilities in order to participate in the [subject] litigation”);

*Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, No. 06-5358 (PKC), 2006 WL

3755175, at *5 (S.D.N.Y. Dec. 20, 2006) (affirming injunction where “the logistical stress on [the

debtor] from attempting to simultaneously undertake a massive reorganization while monitoring

and producing documents in the State Court Action threatened to irreparably impair the company’s

reorganization process”); *Lomas*, 117 B.R. at 67 (affirming injunction where the subject litigation

“would serve as a distraction to key [debtor] personnel, thus causing the corporation and its

reorganization plan irreparable harm”).

55.     Finally, if the Integra Action continues against the Non-Debtor Affiliates, the

Debtors’ estates will be irreparably harmed as obligations are incurred and value is lost on

litigation expenses.  As discussed above, Mariner Central will incur significant indemnification and advancement costs if the Integra Action continues against the Non-Debtor Affiliates.  *See In re 1031 Tax Grp., LLC*, 397 B.R. 670, 685 (Bankr. S.D.N.Y. 2008) (finding irreparable harm where "there is a substantial risk that the Debtors face liability for indemnification if the [subject litigations] are permitted to continue"); *In re Calpine*, 354 B.R. at 50 (finding irreparable harm "through the risk of collateral estoppel and evidentiary prejudice, a drain on its estate due to its indemnification obligations to [the non-debtor defendant] and a significant burden and distraction of key employees from its restructuring effort.").  Such costs or obligations will greatly prejudice the Debtors' estates and impair the Debtors' reorganization efforts.

### iii.        The Balance of Harms Favors the Debtors

56.        The balance of harms weighs in favor of issuing an injunction. As set forth above, the harm to the Debtors – from preclusive rulings, from indemnification and advancement claims, from the depletion of available insurance, from the cost and burden of responding to discovery and managing the defense of the Integra Action, from the diversion of management away from restructuring efforts, and from the adverse impact on the Debtors' restructuring efforts – would be irreparable if this Court does not enjoin the Integra Action against the Non-Debtor Affiliates.

57.        By contrast, there would be only de minimis harm at most to Integra if the Integra Action is enjoined.  The Integra Action is still in its preliminary stages, without even initial disclosures being exchanged yet, and is years away from a judgment.  Integra will suffer no prejudice from a limited delay in reaching a decision on the merits in the Integra Action, and the harm to Integra from such a delay – if any – cannot outweigh the potential harm to the Debtors from proceeding.  *In re Am. Film Techs.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) (finding this factor to be "easily addressed" because "a further delay of limited duration will not cause [the

opposing party] irreparable harm"); *Calpine,* 365 B.R. at 413 ("The inability of [the defendant] to obtain a hypothetical recovery sooner rather than later is not a harm – and is certainly not an irreparable harm – sufficient to outweigh the irreparable harm that [the debtors] will suffer if the [] litigation were permitted to proceed.").

### iv.      *An Injunction Serves the Public Interest*

58.      "In the context of bankruptcy proceedings, the "public interest" element means "the promoting of a successful reorganization." *Am. Film Techs.*, 175 B.R. at 849 (quotation omitted); *see also In re Caesars Ent. Operating Co.*, 808 F.3d 1186, 1189 (7th Cir. 2015) (a section 105 injunction that is "likely to enhance the prospects for a successful resolution of the disputes attending [the] bankruptcy" is appropriate because "successful resolution of disputes arising in bankruptcy proceedings is one of the Code's central objectives.").

59.      Enjoining the Integra Action against the Non-Debtor Affiliates to avoid irreparable harm to the Debtors and facilitate a successful restructuring serves the public interest far more than allowing Integra to continue pursuing its claims (in which the United States has declined to intervene) that are in the earliest stages of litigation.  This relief is necessary for the Debtors to successfully restructure and serves the public interest by promoting compliance with the Congressional purpose of the automatic stay and by facilitating the Debtors' reorganization efforts. The public interest in the Debtors' successful reorganization is particularly acute here in light of the Debtors' role in delivering quality, affordable health care services to historically underserved persons and communities.

### <u>RESERVATION OF RIGHTS</u>

60.      Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, or (ii) a waiver of the Debtors' rights to dispute

or defenses to any claim. The Debtors also expressly reserve their right to assert that any action, including any claim by any governmental unit, is subject to 11 U.S.C. § 362(a).

## NOTICE

61.     The Debtors will serve a copy of this Motion and supporting declarations on the Defendant or counsel for the Defendant, the U.S. Trustee, all parties on the Debtors' consolidated list of 30 largest unsecured creditors, and all parties entitled to notice pursuant to Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice need be provided.


*[ remainder of page intentionally left blank ]*

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached as **Exhibit 1**, extending the automatic stay to stay the continued prosecution of the Integra Action against the Non-Debtor Affiliates, or in the alternative enjoining the continuation of the Integra Action as against the Non-Debtor Affiliates, during the pendency these Chapter 11 Cases and granting such other and further relief as the Court deems just and proper.


Dated: October 4, 2022
      Wilmington, Delaware

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Mary F. Caloway (DE Bar No. 3059)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
          tcairns@pszjlaw.com
          mcaloway@pszjlaw.com

- and -

Hamid R. Rafatjoo (*pro hac vice*)
Carollynn H.G. Callari (*pro hac vice*)
David S. Forsh (*pro hac vice*)
**RAINES FELDMAN LLP**
1350 Avenue of the Americas, 22nd Floor
New York, NY 10019-4801
Telephone:    (917) 790-7100
Email:    hrafatjoo@raineslaw.com
          ccallari@raineslaw.com
          dforsh@raineslaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*